B/C (KC)

**ORIGINAL**

FILED 08 DEC 29 10:40 USDC-ORE

**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF OREGON**

| | | |
|---|---|---|
| **MATTHEW ROBERT YOUNG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. CV '08- 1496 -BR** |
| | ) | |
| **v.** | ) | |
| | ) | **DEMAND FOR JURY TRIAL** |
| **INTEL CORPORATION,** | ) | |
| | ) | **REQUEST EXTRODINARY HEARING** |
| **Defendant,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **STEVE JOBS,** | ) | |
| | ) | |
| **Third Party Defendant.** | ) | |

**CIVIL RIGHTS COMPLAINT BROUGHT UNDER TITLE 18 USC § 1028, TITLE 15 USC § 1713 TITLE 28 USC § 1338, § 1343, AND § 2201 CREATING A REMEDY FOR PROPERTY IN CONTROVERCY TITLE 42 USC § 1983, § 1985, AND § 1986 FRCP RULE B, C, D, AND E ACTION IN REM, QUASI IN REM, IN PERSONAM, ACTION IN PERSONAM CLAIMING VIOLATION OF INTELLECTUAL PROPERTY INFRINGEMENT OF A PATENTABLE INVENTION, AND COPYRIGHTABLE WORK, TRADE SECERTS AND UNFAIR COMPETITION OF THE COMMERCIALLY VALUABLE PRODUCT PRO SE PLAINTIFF SEEKS OR DEMANDS COMPENSATION OF FIVE BILLION DOLLARS [5,000,000,000.00] AND SEEKS A DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

**MATTHEW ROBERT YOUNG**
**Plaintiff in pro se**
**SID No. 6242666**
**777 Stanton Blvd**
**Ontario, OR 97914**

1) Pro se plaintiff, Matthew Robert Young, is a State prisoner confined in the Oregon Department of Corrections, Snake River Correctional Institution, located at 777 Stanton Blvd., in Ontario, OR 97914. Pro se plaintiff herein invokes his Constitutional Rights as a Citizen of the United States of America, to bring this civil action, action in rem, in quasi rem, in personam, as an action in personam as allowed pursuant to **FRCP Rule B, C, D,** and **E** and further as provided by **Title 28 USC § 2201** allowing for the creation of a remedy in a case of an actual controversy over personal property as provided by and allowed under **Title 28 USC § 1338,** in the form of personal intellectual property that is a Trade Secret Right of a commercially valuable product created from pro se plaintiff's intellectual property design of an abstract patentable, and copyrightable invention and works. Pro se plaintiff further claims that these Acts were committed in violation of his clearly established Federally protected Constitutional Rights Against lawful seizure of his personal property, under the **Fourth [4th],** and **fourteenth [14th] Amendments** to the Constitution of the United States. Pro se plaintiff seeks and demands **Five Billion [$5,000,000,000.00] dollars** compensation from **Intel corporation** for receiving of his stolen personal property, transporting of his personal property in the interstate commerce, the aiding in actual concealing of his personal property, and withholding of stolen goods from their rightful owner, even **AFTER** Intel Corporation had been made aware with full knowledge, that pro se plaintiff is the rightful owner, and original inventor of these commercially valuable products, **Therefore** pro se plaintiff prays that the United States District Court will Issue a Judgment Awarding pro se plaintiff the sum demanded above. Pro se plaintiff notes for the purpose of Legal factual contentions that the act of receiving stolen property, as prescribed pursuant to the laws under **66 Am. Jur. 2d** on receiving stolen property that it is not necessary

that **Intel Corporation** be in manual possession or touching of the stolen goods, that any exercising of control or dominion over them is sufficient to constitute a receiving. For this cause pro se plaintiff claims unfair competition, theft of personal property, concealment of personal property, fraud, and monopoly, and unfair trade practice. For this purpose pro se plaintiff further seeks and prays for injunctive relief, in the form of a United States District Court, restraining Intel Corporation, and any of its subsidiaries, associates, or Business partners from seeking, making developing or in any way distributing for profit or otherwise public use, any technological computerized device, application, tool, or commercialize product that incorporates or uses in any way the [**Core-2 Duo Virtualized Technology**].

**2)** Pro se plaintiff request pursuant to **FRCP Rule 54** for Judgment of All Costs, and Court filing fees, attorney's fees, and all other cost and distributions that may incur herein.

**3)** This Civil Action is brought in the United States District Court located at:

**United States District Court for the District of Oregon**
**Mark O. Hatfield U.S. Courthouse,**
**1000 S.W. Third Avenue**
**Portland, OR 97204**

**a)** This United States District Court has Jurisdiction to hear and decide these matters and issues in controversy and to award pro se plaintiff the amount and sum sought herein pursuant to **Title 28 U.S.C. § 1332, § 1337, §1338, §1343, § 2201, § 2202** and **Title 42 U.S.C § 1983, § 1985**, and further under **Title U.S.C. § 1986.** Pro se plaintiff reserves the right to amend this jurisdiction pursuant to **Title 28 USC § 1653.**

**b)** Pro se plaintiff **Matthew Robert Young** is [a citizen of Oregon]. The defendant **Intel Corporations** is [a citizen of Oregon] [a corporation incorporated under the Laws of Oregon, with its principle place of business in Oregon]. The amount in controversy is **Five Billion**

**Dollars [$ 5,000,000,000.00]** without interest and costs which exceeds the sum or value specified by **Title 28 U.S.C. § 1332,**

**c) Steve Jobs** is a [citizen of California] and here after the filing of this complaint, will be omitted as a party, until such time as **Intel corporation** moves to include him as a third party defendant, enjoining pro se plaintiff in a cause raising the claim of Fraud, and material misrepresentation with respect to information not included in the statement of property purchased or received form **Mr. Steve Jobs.**

**d)** The third party defendant **Steve Jobs** will hereafter be omitted as a party, in that at this time **Mr. Jobs** [is not subject to this Court's jurisdiction] and therefore cannot be made a party, without depriving this Court of subject matter jurisdiction in this cause of action, Because to the best of pro se plaintiff's knowledge, **Mr. Jobs** was [a resident of the state of California] when he defrauded **Intel Corporation**, about where, and from whom he actually acquired the *Designs*, and *Schematics* from, which **Intel Corporation** actually then developed the **[Core-2 Duo, Virtual Technology**], from.

e) *Therefore it is **Intel Corporation**'s position to enjoin pro se plaintiff in a separate action against Steve Jobs, unless this court allows **Intel Corporation** to do so in this civil action, pursuant to **LR (Local Rules) 14 (a) – (a),** Holding that a defending party, may as a third party plaintiff, cause to be served with Summons and Complaint, a person who is not a party, **(which here after Steve Jobs, will be omitted as a Party)** as a person liable for the plaintiff claims against the defending party. **FRCP 14 (a).***

## PLAINTIFF

4) **Matthew Robert Young** is the plaintiff proceeding in pro se, in this civil action, **Date**

**of birth July 4th 1965, place of birth Albuquerque, New Mexico.** Pro se plaintiff is currently being unlawfully held and restrained of his liberty and freedom in the Snake River Correctional Institution, which is located at 777 Stanton Blvd., Ontario, OR 97914, which subject matter is currently being brought on a separate civil action in this **United States District Court, Civil No. 08-1138-PK.**

## DEFENDANTS

5) **Intel Corporation** is the liable Defendant in this civil action, and is a Corporation within the jurisdiction of this United States District Court, and for the purpose of this civil action to be held liable of the laws cited and raised here. **Intel Corporation** is considered a citizen for the purpose of this civil action, and made subject to liability pursuant to **Title 28 USC §1332©(1), and Title 42 USC §1985, § 1986**, and is located at **2111 N.E. 25th Ave., Hillsboro, OR 97124.**

6) **Steve Jobs** is the third party defendant, and is in fact liable to **Intel Corporation**, he is Located in California.

## QUESTIONS OF THE CHARACTER OF THE CLAIMS AND ADDMISSIBILITY OF THE NATURE AND WEIGHT OF SUPPORTING EVIDENCE

7) Pro se plaintiff intends to bring into focus the central characteristics of pro se plaintiff's claims as they are supported by such evidence that when viewed under the Uniform Administration of the Laws of the United States, do establish themselves as factual contentions, and further brings them within the scope of these applicable Laws, as to the sufficiency of the substance of their subject matter, as the required elements needed to establish his compliant as an appropriate pleading within the scope, and Design of **Title 28 USC § 2201**, providing that any court of the United States, upon the filing of an appropriate pleading may declare the rights of

the parties and other legal relations of any interested party seeking such declaration.

**a)** Pro se plaintiff's factual contentions are such that, at an evidentiary hearing pro se plaintiff will prove that there exist absolutely no opposing genuine issues of any material facts to even remotely challenge the truthfulness of their probative value.

**b)** Pro se plaintiff make this declaration: **[THAT]**, ***If anyone in the world today can come before this Court, at an evidentiary hearing, and present to this Court a creditable challenge, (which would be during an Evidentiary Hearing Held Before this Court, wherein All of the parties are provided time chance and the opportunity to present to this court the actual applications for these commercially valuable products)***, which are known as the [**Core-2 Duo Micro Processor, and Virtual Technology**], allegedly invented by **Intel Corporation,** then pro se plaintiff agrees to be **HELD** *liable* for the **Ten Thousand Dollar [$10,000.00]** civil fine fees. ***But first*** here is pro se plaintiff's standing upon factual contention as required in part by **FRCP Rule 11**, which pertains to ***[the proprietary information, the actual trade secrets]*** of the true application of the **[Core-2 Duo micro processor, and Virtual Technology**], of which **Intel Corporation** only knows the potential Applications of these Technology products, as **Intel Corporation** was provided by **Mr. Steve Jobs**, and not it true Technological ***Trade Secret Designs*** that will make these commercially valuable Technology products work, and perform to their *fullest ability*, and *capacities*.

**c)** Pro se plaintiff is the only person in the world at present who knows how to make both the **[Core-2 Duo micro processor, and the Virtual Technology**] work, and pro se plaintiff can in fact come before this U S District Court and prove it by a factual ***DEMONSTRATION.***

**8)** Pro se plaintiff further brings this civil action under the federal jurisdiction of this U S

**MATTHEW ROBERT YOUNG**
**Plaintiff in pro se**
**SID No. 6242666**
**777 Stanton Blvd**
**Ontario, OR 97914**

District Court pursuant to the **Federal Rules of Evidence Rules 104 (a)(b) & (e), Rules 106, 201 (b) on kinds of facts, (d) when mandatory (e) opportunity to be heard and (f) time for taking notice; Rule 301, 302, 401, 402 and 404 FRCP Rules B, C, D and E.**

**a)** It is pro se plaintiff's intent to further bring into focus here, the central ideal of the characteristic of pro se plaintiff argument substantiating his claims, as they are supported by such evidence that under the uniform administration of the Laws governing, do establish his claims as factual contentions that are the subject matter, of the type of substance that is required in order to establish this complaint as an appropriate pleading that declare the Rights under the Laws that mandates other legal relations..

**b)** Pro se plaintiff ***declares*** here that this action is a **JUST** cause, and not for harassment purposes, further Pro se plaintiff makes in his ***declaration*** a request for this United States District Court to **HOLD** a simple ***exemplary test*** under seal of this court, for this Court have pro se plaintiff brought before It to give a Demonstration for this Court in person, exactly just how the computer [**Technology** which **Intel Corporation** calls **Virtual Technology** the **Micro Processor** which **Intel Corporation** calls **core 2 – DUO]**, works and to seal this ***proprietary information*** which pro se plaintiff will Demonstrate for this Court, to be products that were in fact Developed, Manufactured, and Built from pro se plaintiff's personal intellectual property to which **ONLY** pro se plaintiff's Holds the **FULL** Knowledge of the ***[proprietary information trade secret.]***

**c)** pro se plaintiff, further request that this United States District Court Order that **Intel Corporation** bring in it's *best* and *brightest engineers*, Before this Court under the same sealed Hearing conditions as pro se plaintiff is Brought, and have *anyone* of them, or *anyone in the*

*world*, who **Intel corporation** can find who can Demonstrate for this District Court, the Actual Application of how the [**Virtual Technology or Core 2 – DUO**] actually works, if they (*can*) then as stated above, under the federal laws governing civil actions pro se plaintiff (*shall be)*, if he fails to Demonstrate his ***trade secret,*** be held liable to the defendant(s) for **Ten Thousand Dollars** [**$10,000.00**] and to this requirement pro se plaintiff is two hundred percent **(200%)** in agreement with this. **HOWEVER** when **Intel Corporation** ***FAILS*** to give a Demonstration, pro se plaintiff **DEMANDS** just compensation of **Five Billion dollars [$5,000,000,000.00]** and any and all ***Patents, copyrights, Trademarks, Monies, Money Contrasts, Transactions, Records and all Documentation, Agreements, Trades, Stocks, Bonds, and any other business conducted or engaged*** in concerning the [**Core 2 – DUO**, and **Virtual Technology**] and **ALL MONEY PROFITS** made received and profited there form, once pro se plaintiff demonstrates for this United States District Court the fact of his Ownership as the Original Inventor of these Technological commercially valuable products.

**QUESTIONS OF LIBALITY**

9) In assessing the question of liability pro se plaintiff first turns to the supreme law of the **LORD GOD OF HOST**, because these are in fact the very same Laws upon which this Land of America, and the United States was founded upon and herein will further serve to clarify when a person is liable for their actions, and further establishes When they do wrong without knowing it and when they Knowingly do wrong and continues to do so with little regard for the fact that the Act or Acts of the wrongful conduct violates the Laws governing them [Note: ***This is not a legal argument***] but rather it is pro se plaintiff's intent to bring into focus grounds upon which relief may be Granted, and Monetary Damages Awarded, in that this is an extraordinary

civil action created as allowed pursuant to **Title 28 USC § 2201.**

**a)** In **Romans** Ch. 3, v. 19 & 20 THE **LORD GOD OF HOST** Declares

> v. 19 ***Now we know that what things so ever the law saith, it saith to them to them who are under the law: that every mouth may be stopped and all the world may become guilty before God.***
>
> v. ***20 Therefore by the deeds of the law there shall no flesh be justified in His sight: for by the law is the knowledge of sin.***

**b)** So it follows that ***liability*** is upon to those who are under the ***Law*** and who have ***knowledge*** of it.

**c) Intel Corporation** is liable to pro se plaintiff because as a citizens of the United States, resident citizens of the State of Oregon, **Intel Corporation** operates and conduct it's Business Transactions and affairs under the Laws enacted by the House of Congress of the United States, the Constitution of the State of Oregon, and the Oregon Administrative Rules, and Statutory Laws of the State of Oregon

**d) Intel Corporation**, in order to be incorporated, and to operate and conduct any Business Transaction or Affairs must first be Licensed, and Insured to do so, with Knowledge and understanding of the Laws governing Corporations and their Liabilities.

**e)** Pro se plaintiff has in fact communicated and established himself to **Intel Corporation** as the rightful owner and the original creator, inventor of the [**Core-2 Duo Micro Processor**], and [**Virtual Technology**] that **Intel Corporation** has in fact been marketing and selling for monetary financial profit on the commerce and trade interstate commercial world market, with full knowledge and understanding that the technological products, merchandise goods, or property in controversy does in fact belong to pro se plaintiff, without pro se plaintiff's

**MATTHEW ROBERT YOUNG**
**Plaintiff in pro se**
**SID No. 6242666**
**777 Stanton Blvd**
**Ontario, OR 97914**

permission, authorization or consent to do so, and without ever once paying pro se plaintiff any monies, and or sharing any of the profits with pro se plaintiff, or offering pro se plaintiff any form of ***just*** **Compensation Stocks, Bonds, Shares, etc.**

**STATEMENTS OF CLAIMS CAUSE OF ACTION**

**CLAIM I**

**10)** In **March** or **April** of **2003**, pro se plaintiff, sent a copy of the Designs and Schematics, of his intellectual property, a patentable invention, and copyrightable work, to wit; a ***Hacker proof, Virus proof*** Computer, with ***Multi phase Microprocessors***, which pro se plaintiff calls **[LANCELOT]**, for it impervious ability to being Hacked into and its ability to fight off Viruses, to **Steve Jobs**, at **Apple Computer**, in California, but did not send **Mr. Jobs**, the ***proprietary information***, which is the ***Trade Secret.*** See Attached Exhibits Marked **PRO SE PL. EX.** 1 .

**a)** Pro se plaintiff requested that **Mr. Jobs**, Help and Assistance him in developing and Marketing, his intellectual property patentable invention, or buy it from pro se plaintiff for **Two Hundred and Fifty Million Dollars [$ 250,000,000.00]**, and that upon receiving a contractual signed agreement, then pro se plaintiff would agree to sent to **Mr. Jobs**, the ***Proprietary Information***, the ***Trade Secrets*** on how to make this computer Technology work.

**b) Steve Jobs,** never replied to pro se plaintiff.

**CLAIM II**

**11)** In the latter part of that same year, **2003, Steve Jobs**, took pro se plaintiff's ***intellectual property*** patentable inventions, to **Intel Corporation.** The exact nature and extent of the Agreement between **Mr. Jobs,** and **Intel Corporation** is not known to pro se plaintiff at this

time.

**a)** It remains however a fact that **Mr. Steve Jobs,** *Defrauded* **Intel Corporation,** by not totally Disclosing to, and Informing **Intel Corporation** just where exactly he got it, and from whom he actually did get the ***Designs*** and ***Schematics*** for the **Dual-Core/ Core-2 Duo Microprocessor,** and **Virtual Technology**.

**CLAIM III**

**12)** In **June** of **2006, Intel Corporation's** senior vice president **Mr. Pat Gelsinger,** is seen being photographed in the Oregonian News Paper, Holding in his left hand, a computer mother board, which **Intel Corporation** later termed **Virtual Technology.** With the help of **EMC** Corporation's **VMware Inc.** unit, who **Intel Corporation** paid **Two Hundred Eighteen Million Dollars,[$ 218,000,000.00]** to **HELP Intel Corporation,** to try figure out pro se plaintiff's ***proprietary information, Trade Secrets,*** See Attached Exhibit Marked **PRO SE PL. EX.** 2+6

**a)** Pro se plaintiff can in fact come Before this U S District Court, and prove conclusively that the computer mother board, which **Mr. Gelsinger**, is holding in his hand, in the News Paper is in fact a product created and manufactured from pro se plaintiff's ***intellectual property Design,*** patentable invention, of **[LANCELOT]** the ***Hacker proof, Virus Proof computer***. See Attached Exhibits Marked **PRO SE PL. EX.** 1 .

**b) Intel corporation** has publicly Announced that **Intel Corporation** rolled out the first dual-core microprocessor in the latter part of 2005, and in that same Public Announcement, stated that **Intel Corporation** is seeking **HELP** from *universities* and *programmers*, to **HELP Intel Corporation [SOLVE the multithreading]** problems that Intel cooks up. See Attached

Exhibit Marked **PRO SE PL. EX. 3** . This is in fact an explicit **PLEA** from **Intel Corporation** ***albeit an implicit*** **PLEA** by **Intel Corporation** for any one to **HELP Intel Corporation** try to figure out how to make this Technology work.

**CLAIM IV**

**13)** after learning that that computer microchips Grossed over **Two Hundred and Forty Six Billion Dollars [$ 246,000,000,000.00]** world wide in 2006, pro se plaintiff In **February 2007**, sent to **Intel Corporation** a letter of acknowledgment and ownership of the [**Core-2 Duo Processor** and **Virtual Technology**], in which pro se plaintiff made certain demands, and placing certain restrictions, and obligations on any *Letters, Response, Reply, Communiqués*, or interacting *Missives*, to which **Intel Corporation** did in fact, in large part complied with, which in turn was an Act by **Intel Corporation** establishing that **Intel Corporation's** does in fact Acknowledge that pro se plaintiff is the Rightful owner of, and original inventor and creator of the **[Dual core / Core-2 Duo Microprocessor, and the Virtual Technology].**

**a)** In his Communiqué to **Intel Corporation,** Pro se plaintiff addressed **Intel Corporation** in this manner;

> Dear **Intel Corporation**;
>
> Does this look familiar? Well it should. It is the **Hacker Proof, Virus Proof** Computer, that I invented, which I Call [**LANCELOT**]. I showed it to **Steve Jobs**, at **Apple Computer**, and asked him for **Two Hundred** and **Fifty Million Dollars,** he took it to you at **Intel**, and you built it but you do not know how to turn it on.
>
> So here is what you are going to do. You are going to Agree to pay me **Seventy Percent (70 %)** every thing that You Gross Off of it, and then I will tell you how to turn It on and make it do what I Designed it to do.

> You have **30 days** to **Respond**, on **Bonded paper**, ***with* your *Signature written in Blue ink***, or I am going to send copies Of my schematics to **AMD (Advance Micro Devices)** and Tell them how it works for next to nothing.

**b) Intel Corporation** responded exactly in the manner **DEMANDED** by pro se plaintiff, meeting the required conditions, and obligations placed on the Response by pro se plaintiff, See Attached Exhibit Marked **PRO SE PL. EX.** 4.

**c)** Pro se plaintiff request that this U. S. District Court pay special Attention to the fact the even though, **Intel Corporation** did ***not*** agree to pay pro se plaintiff **Seventy Percent (70%) Intel Corporation** *Never* once ***Denied*** nor even tried to ***Challenge*** pro se plaintiff's position as the Rightful Owner, and Original Creator, and Inventor of the **Dual-Core Microprocessor**, and the **Computer mother board,** latter call **Virtual Technology,** seen being Held in the hand of **Intel Corporation's** senior vice president **Mr. Pat Gelsinger**. See Attached Exhibit Marked **PRO SE PL. EX.** 4+7.

**d)** When **Intel Corporation** replied within Two and one half weeks, in the manner **DEMANDED** by pro se plaintiff, pro se plaintiff, wrote to **Intel Corporation** a second time, and in this *Communiqué* pro se plaintiff did not address **Intel Corporation** so harshly, and made **Intel Corporation**, what pro se plaintiff believed to be a ***fair*** proposition, which was stated to this effect;

> Dear **Intel Corporation:**
>
> Thank you for responding in the Manner that I requested, And since you did it may not have been your fault and that you may not have known that **Steve Jobs** lied to you, so here is my Offer to you, Sign a Contractual Agreement with me where **Intel Corporation** will agree to pay me **Fifteen Percent (15%)** Of every thing that you make on my Hacker Proof, and Virus Proof Computer [**LANCELOT**], and also *sign a Contractual*

*Agreement to manufacture build, and Market for me, my Computer Chip Microprocessor,[**TRADWAY**].*
Please note that the **SAME** Conditions apply here, ***30 days,*** with ***Your signature in Blue ink*** on ***Bonded paper.***

**e) Intel Corporation** Responded just as pro se plaintiff Requested, within **Three (3) weeks,** on **Bonded paper,** with the **Signature in Blue ink.** See Attached Exhibit Marked **PRO SE PL. EX.** 5 ,

**f)** Again pro se plaintiff Request that this U.S. District Court pay special attention to the fact that *AGAIN* **Intel Corporation** did not Challenge or Deny that pro se plaintiff is the Rightful owner of this Technology.

**CLAIM V**

**a)** According to various News Paper Publications, **Intel Corporation** has Made over **Fifty Billion Dollars [$ 50,000,000,000.00]** profit off of pro se plaintiff's intellectual property patentable invention, which **Intel Corporation** calls **[Core 2, Duo Processor]** alone, and pro se plaintiff can not even guess how much **Intel Corporation** has made off of pro se plaintiff's intellectual property patentable invention, which **Intel Corporation** calls **[Virtual Technology]**

**b)** But **HERE IS A FACTUAL CONTENTION, AND ISSUE AT LAW, AT COMMON LAW, Intel Corporation** would **NOT HAVE** this *Money, Profits, Stocks, Bonds*, and position as the *Main supplier*, and *principal provider* of the Worlds *Computer Microchips*, HAD Steve Jobs NOT provided **Intel Corporation,** a copy of pro se plaintiff's Intellectual Property Designs, and Schematics from which **Intel Corporation** then manufactured the Dual Core Multiphase Microchip Processor.

**c)** Even after pro se plaintiff has **CONCLUSIVELY PROVEN** to **Intel Corporation**

that he is in fact the Rightful Owner, and the Original Inventor of this Technology, **Intel Corporation** continues to violate pro se plaintiff's Constitutional, and Common Law Rights to enjoy the Fruits of his labor, **Intel Corporation** in its unfair trade practice, continues even after becoming aware that pro se plaintiff is the rightful owner, and original inventor of this technology, knowingly conceal, withhold, transfer in interstate commerce, sell on the world commercial market for the sole purpose of illegally profiting from pro se plaintiff's personal intellectual property patentable inventions, and copyrightable works without pro se plaintiff's approval, authorization, consent, and against pro se plaintiff's wants and desires, without being ***Grateful*** or ***showing*** any ***consideration*** to the fact that had it not been for pro se plaintiff's ***intellectual property patentable invention designs and schematics,*** **Intel Corporation** would *NOT* be the ***World leader*** in computer microchips Today, **AMD (Advanced Micro Devices),** or **Micron Technology** could have just as easily have been the ***World Leader*** in manufacturing computer microchip processors with pro se plaintiff's intellectual property patentable inventions. See Attached Exhibit Marked **PRO SE PL. EX.** 7+10

**RELIEF SOUGHT**

**THERFORE** Pursuant to the United States Code Amendments cited above in this civil action, with emphasis at **Title 28 USC § 1343 (a) (1) (2) (3),** and **(4), § 1338,** and **§ 2201;** This United States District Court has the Authority and needed Jurisdiction to Render Judgments, and Issue Orders directed at and to the parties here in this civil action, and to ORDER that an Extraordinary Hearing be Held, and Conducted wherein the parties must perform under seal record of this U S District Court a Demonstration of the Actual Trade Secrets the Proprietary Information pertaining to the Commercially Valuable Products called **Dual Core, Core 2 Duo**

**MATTHEW ROBERT YOUNG**
**Plaintiff in pro se**
**SID No. 6242666**
**777 Stanton Blvd**
**Ontario, OR 97914**

Micro Processor, and the Computer Technology called **Virtual Technology.**

**MATTHEW ROBERT YOUNG,** The Clamant Plaintiff proceeding in pro se, **DEMANDS** Just Compensation Awards in the Sum and Amount of **Five Billion Dollars, [$ 5,000,000,000.00]** for the unauthorized use and profits made from pro se plaintiff's intellectual personal property patentable invention, and copyrightable works.

Pro se plaintiff further DEMANDS Compensatory Awards of ALL of the Patents, Copyrights, Trademarks, Proceeds Monies, Stocks, Bonds, Securities, and Contracts, Agreements, and any and ALL Business DEALS made generated and or agreed to in regards to the Commercially Valuable Products called Core 2 Duo, and Virtual Technology.

Pro se plaintiff Request that this United States Court Issue and Injunction prohibiting **Intel Corporation** its subsidiaries', Business partners, Associates, and or any person or Citizen within this Courts Jurisdiction to Order World wide from manufacturing, building, marketing, selling or otherwise pertaining to the Technology stated and mentioned in this civil action.

Executed on this 17 day of December, 2008

**MATTHEW ROBERT YOUNG**
**Pro se plaintiff**

**I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.**

**Signed and Dated this 17 Day of December . 2008**

**MATTHEW ROBERT YOUNG**

**MATTHEW ROBERT YOUNG**
**Plaintiff in pro se**
**SID No. 6242666**
**777 Stanton Blvd**
**Ontario, OR 97914**



Fig.13
Fig.12
Fig.10
Fig.11
Fig.15
Fig.14
Fig.9
ORIGINAL
Fig.5-6-7&8
Fig.4
Fig.3
PRO SE PL. EX. 1

PRO SE PL. EX. 2

Courtesy of INTEL CO

Intel Senior Vice President Pat Gelsinger shows off the company's new dual-core technology Tuesday in San Francisco. The chip maker says its newest generation of microprocessors will perform better and use less energy than existing Pentium 4 chips.

## Two-brain chip

Intel's dual-core processors have two digital engines on one piece of silicon, enabling faster multiple-computing tasks.

Tasks Output

Single-core processor

Dual-core processor

URCE: Intel The Associated Press

# Chips: Intel will rely on others to write programs

Continued from Page D1

be as much as a decade behind hardware development.

Intel rolled out its first dual-core microprocessors late last year, and said this week that it plans to update them with a new energy-saving chip architecture in the third quarter of 2006. By the end of this year, Intel said, nearly three-quarters of all the microprocessors it makes will use dual-core technology.

Sometime in 2007, Intel plans to introduce "quad-core" chips with four microprocessors. In time, the company hopes to put dozens or perhaps hundreds of microprocessors on chips. Computers with such power might be able to drive and steer a car, for example, or perform other tasks well beyond the scope of today's technology.

But it's not going to happen right away. Intel said this week that it will move conservatively to introduce eight-core chips — and beyond — because computers can't yet use them.

Multi-core chips must be programmed to coordinate their work and access to computer memory, so the work of each processor doesn't conflict with the work of another. Intel calls such programming, which instructs multiple processors to work in parallel, "multi-threading."

While Intel has overcome the basic hardware challenge behind multi-core chips, it will have to rely on other companies to write such programs. As encouragement Wednesday, Intel highlighted the work of Pixar Animation Studios, which has developed computer software that takes advantage of the additional computing power multi-core chips provide to produce more detailed animation.

Intel introduced new development tools for programmers Wednesday, too, and said it will work with universities to teach multi-core programming. It also announced promotional contests to pique developers' interest, promising $5,000 prizes to programmers who solve multi-threading problems that Intel cooks up.

Multi-core chips bring to challenges to mainstream computing that had previously been confined to theory and to the specialized

PROSE PL. EX. 3

ORIGINAL

**ORIGINAL**

**Intel Corporation**
2111 N. E. 25th Ave.
JF3-147
Hillsboro, OR 97124

March 2, 2007

Mr. Matthew Young
SID No. 6242666
777 Stanton Blvd.
Ontario, OR 97914

*Re:* *Young - Lancelot*
Our Ref.: 2007-001728

Dear Mr. Young:

We have received the materials you provided to us in connection with the above-referenced matter. After consideration and review of the submitted documents, Intel has determined not to pursue this matter.

Thank you for your interest in Intel Corporation and for bringing this opportunity to our attention.

Sincerely,

Gwen Olds

Gwen Olds
Outside Submissions Coordinator

PRO SE PL. EX. 4

GO/dc

# *Intel to Invest in Virtualization Leader*

By DON CLARK

Chip giant **Intel** Corp., in agreeing to invest $218.5 million in **EMC** Corp.'s VMware Inc. unit, provided evidence that a it technology called virtualization is spawning new alliances and posing challenges to **Microsoft** Corp.

The deal, announced yesterday, comes as VMware is preparing for a closely watched initial public offering. It also coincides with a growing debate about whether virtualization helps or hurts computer security—and whether Microsoft is misusing software licenses to slow its spread.

Intel, of Santa Clara, Calif., said its venture-capital arm will pay $23 a share for a stake representing 2.5% of VMware's common shares after the offering. The companies, already partners, said they will broaden work on joint marketing and technology development. An Intel executive will become a director of VMware, a Palo Alto, Calif., company that expects to raise $741.4 million from the offering.

Virtualization uses software that emulates the features of a computer, making it easier to run multiple operating systems and application programs on a single machine. That benefits companies by using a greater portion of servers' computing capacity, reducing the need to buy additional systems.

The program between the operating system and the hardware—called a virtual machine—can be used to partition PCs so viruses and other malicious programs can't attack sensitive parts of a system. Intel, though it plans to keep collaborating with Microsoft, also wants to help computer makers build in what it calls security "appliances"—specialized software, encapsulated along with a stripped-down operating system by a virtual machine, that could guard against dangerous software.

"We firmly believe that virtualization is a key technology to solving a whole bunch of problems," said Steve Grobman, an Intel director of business-client architecture.

But one concern is whether hackers could create virtualization software that boots up before a computer's operating system to secretly perform mischief, said Oliver Friedrichs, director of emerging technologies in Symantec Corp.'s security-response unit. Symantec is working with Intel on virtualization-based products and believes such malicious code could be detected.

Microsoft, which has cited VMware as an emerging competitor, added language to the licensing agreements for two consumer versions of its Windows Vista operating system that bars users from using virtualization. More costly versions of Windows Vista weren't covered by the prohibition.

The policy irked competitors, including VMware and Parallels Inc., a unit of **SWsoft** Inc. that offers a popular program that helps users of **Apple** Inc.'s Macintosh system run Microsoft Windows. Microsoft caused further consternation last month by informing reporters and analysts it was about to relax the restrictions—and then reversing that decision shortly before it was due to be announced. A draft announcement explained the proposed policy change as a response to customer "feedback"—but so did a subsequent Microsoft statement saying it was dropping the change.

Competitors and some analysts are skeptical about Microsoft statements that it was motivated by security concerns. They suggest it hopes to slow customer adoption of virtualization until it introduces more sophisticated products.

Though virtualization could help sell more Microsoft operating systems, it could also shift more control over the basic functions of PCs from the company to computer makers, said Neil MacDonald, an analyst with market researcher Gartner Inc.

A spokesman for Microsoft declined to comment on its recent flip-flop or the criticisms of its licensing policy, stating only that it "has reassessed the Windows virtualization policy and decided that we will maintain the original policy announced last fall."

PRO SE PL. EX. 6

ORIGINAL







SONY

Sony® recommends Windows Vista® Home Premium

# Watch computer.

The Sony VAIO® LT PC/HDTV with Intel® Core™ 2 Duo processor.
Born out of Sony HD technology. Learn more at sony.com/hdna

Do More

ORIGINAL

PRO SE PL. EX. 7



**ORIGINAL**

THIS IS the "NIMROD" system
NIMROD can Trace a virus of Hacker Right to The very phone the it came form.
The "EPIPHAGON" a seven sided polyhedron

PRO SE PL.EX.10

MISCELLANEOUS EXHIBITS

# Internet ID crooks get Munster of a number

**Bogus data** | TV character's information is posted on site thieves use to sell details

THE ASSOCIATED PRESS

WASHINGTON — Did Internet thieves steal Herman Munster's Mastercard number?

Crooks in an underground chat room for selling stolen credit card numbers and personal consumer information offered pilfered data purportedly about Herman Munster, the 1960s Frankenstein's monster-like character from "The Munsters" TV sitcom.

The thieves apparently didn't realize Munster was a fictional TV character and dutifully offered to sell Munster's personal details — accurately listing his home address from the television series as 1313 Mocking Bird Lane — and what appeared to be his MasterCard number. Munster's birth date was listed as Aug. 15, 1964, suspiciously close to the TV series' original air date in September 1964.

CardCops Inc., the Malibu, Calif., Internet security company that quietly recorded details of the illicit but wayward transaction, surmised that a Munsters fan knowledgeable about the show deliberately provided the bogus data.

"The identity thief thought it was good data," said Dan Clements, the company's president.

Clements said evidence indicates the thief, known online as "Supra," was operating overseas. "They really stumble over our culture. He's probably not watching any reruns of 'The Munsters' on TV Land."

CardCops eavesdrops on conversations among thieves in underground Internet chat rooms to monitor for stolen credit card numbers being sold or traded. It offers monitoring services to alert consumers whose information is compromised by hackers.

**Daily market news on your cellphone**
Send a text message to **44636** (4INFO) with **MNEWS** for the latest headlines.

**Hackers develop new cybercrime**

A new report by antivirus software vendor Symantec details a startling trend that highlights how criminals are figuring out ways to make money online. Hackers are sometimes breaking into online businesses and not stealing anything. Instead of swiping all the customer data they can get their hands on, a small subset of hackers have concerned themselves with stealing only a specific thing from the vendors they breach — they want access to the compromised companies' payment-processing systems, and nothing else, says the Symantec Report on the Underground Economy out today. Those systems allow the bad guys to check whether credit card numbers being hawked on underground chat rooms are valid, the same way the store verifies whether to accept a card payment.

ORIGINAL

# ...pam, scams and software steals

## ...er Monday may be big ...etailers – and hackers

...wartz
...DAY

...FRANCISCO — Today will be one of the biggest ...line shopping days of the year, and also one ...ost treacherous.

...ber Monday, the first Monday after Thanks... consumers are expected to spend $821 mil... year, up 12% from 2007, says Robert Williams, CEO of Conversive, a ...ology customer-service software company for online merchants. Today ...the biggest day in a $44 billion online holi...pping season, predicts Forrester Research.

...wobbly economy, combined with a con...hirst for too-good-to-be-true bargains, has ...ed cybercrooks to unleash a torrent of spam, phishing scams and malicious software.

▶ Bargains boost holiday sales, 1A

"The downturn will prompt more attempts by cybercrooks, because consumers — in their haste to save costs — may be more susceptible to scams," says Ori Eisen, founder of 41st Parameter, an Internet fraud detection and prevention service.

Threats are everywhere, PC security experts say, and today will bring a plague of them. Last year, phishing attacks soared 300% on Thanksgiving, compared with the previous few days, and this year is expected to be worse, computer-security firm Cyveillance says. It predicts cybercriminals this year will launch even more sophisticated phishing attacks on bargain-hunters, as well as on small businesses and credit unions that lack strong anti-virus software and firewalls.

Mainstream sites aren't completely safe, either, says Mike Van Bruinisse, president of computer-security firm Purewire. Some enterprising hackers have injected malicious software code into user comments and ads with links to popular e-commerce sites. "Stick to core content on those sites, and don't get distracted by other stuff," Van Bruinisse says.

Crooks also have targeted online buyers eschewing credit cards in this economy for debit cards, says Paul Henninger, director of fraud solutions at anti-fraud software maker Actimize. Debit card fraud is especially perilous because it gives hackers access to a bank account, he says.

Still, consumers can take simple steps to protect themselves. Security experts urge PC users to be wary of cut-rate deals from unfamiliar online merchants. They also suggest using multiple passwords when shopping and using the most up-to-date Web browsers and anti-virus software.

"Look, the Internet can be scary," says Michael Barrett, chief information security officer at PayPal, eBay's online payments unit. "But you can be pretty safe if you take precautionary measures."

# BUSINESS TECHNOLOGY

# Oracle Upgrade Is Giving Pause

## *Some Possible Users See No Need to Jump From Old Database*

By Vauhini Vara

**Oracle** Corp. plans to unveil a new version of its core software tomorrow for the first time in four years. But customers like Mark Showers have already decided to sit out the event.

Oracle is launching a version of its "database management system" software, dubbed version 11g, that lets companies retrieve and make sense of their digital data. But Mr. Showers, chief information officer at agricultural giant **Monsanto** Co., says his company is likely to take at least two or three years to start moving from the previous version, 10g—double the time Monsanto once took.

That's because it typically takes at least several months for a company to fully shift to a new version of Oracle's database software—the larger the company, the longer it takes—and lately, Oracle has made several small, incremental changes in new releases rather than a few large, important ones that would compel a company to quickly switch.

St. Louis-based Monsanto employs 17,500 people and has annual revenue of $7.3 billion. "For a company like Monsanto, these new releases are a bit like turning the battleship," Mr. Showers says. Without many must-have additions, he sees little need to move quickly.

**Lion's Share**

Share of world-wide relational-database market in 2006

Sybase 3.2%
Teradata 3.2%
Others 7.9%

Note: Figures don't add up to 100% due to rounding
Source: Gartner

Mr. Showers's view is echoed by other corporate tech managers, highlighting maturation in the database industry. Whereas database releases were once seen as revolutionary and typically sparked a buying frenzy, the new one offers relatively incremental change. The lukewarm reception echoes a phenomenon taking place elsewhere in software: **Microsoft** Corp.'s latest Windows operating system, called Vista, received far less fanfare when it was released for consumers this year than, say, Windows 95 did.

Still, expected changes in 11g illustrate an evolution in how corporate tech buyers use software, says Bhavish Sood, an analyst at Gartner Inc. In the 1980s, database software boomed as companies scrambled to replace outdated file-management systems. In the 1990s, they invested in more database software to support new programs for tasks like tracking customers and managing Web sites.

Early in this decade, purchases slowed in a tough economy. Now, companies are again buying, to take advantage of security improvements and to interact with "business-intelligence" software that helps track the health of their business.

Oracle isn't offering details of 11g until its launch in New York tomorrow, but people briefed on the product say it will include improved security features and better capabilities for making sense of content such as video files and Web content. The Redwood Shores, Calif., company also hasn't revealed its pricing plans. An Oracle spokeswoman declined to comment.

As high-tech thieves increasingly use the Internet and other means to sneak into corporate databases, Oracle and others have been under pressure to give companies a better way to control access, says Toby Weiss, chief executive of **Application Security Inc.**, a New York database-security firm. Application Security has tested 11g, and Mr. Weiss says it is more secure, in part because of features that let companies better audit the activity inside their databases and put more specific restrictions on each user. The new version is also expected to make it easier to pull together "unstructured" data like Web content and video files.

Oracle is trying to whet companies' appetite for new software through discounts, with the expectation that customers will pay big fees for continuing technical support. David Hauser, chief technology officer of **GotVMail Communications** LLC, a telecom company in Weston, Mass., has lately negotiated discounts of 50% on Oracle software with the help of **Miro Consulting** Inc. Still, Mr. Hauser doesn't expect to move to 11g for at least two years. "The large feature sets have already been accomplished," he says. "Now it's small things. I'm not going to upgrade just for that."

And Oracle increasingly faces competition from lower-cost database alternatives from rivals like Microsoft. Arindam Sen, lead database administrator at American Power Conversion Corp., part of **Schneider Electric** SA of Rueil-Malmaison, France, says he often gets phone calls from Oracle salespeople trying to persuade him to switch from Microsoft's SQL Server software.

SQL Server costs less than Oracle's software, but Oracle's database software is considered heavier-duty, more appropriate for big companies. In recent years, though, "Microsoft has caught up with Oracle" in software reliability and performance, Mr. Sen argues. So he is sticking with Microsoft, which he says saves him $700,000 to $800,000 a year compared with Oracle.

miscellaneous Exhibits

ORIGINAL

# Cybercriminals can't get away with it like they used to

## Authorities having greater success tracking them down

By Jon Swartz
USA TODAY

SAN FRANCISCO — In what is shaping up as a breakthrough year, federal authorities have quietly cracked down on some of the biggest Internet crime rings.

**Technology**

Secret Service and FBI operations since January have broken up a huge forum for stolen credit cards and shut down the world's largest spam ring. Investigations have led to indictments of other high-profile spammers and 11 people allegedly behind the computer break-in at TJX and other major retailers.

The FBI and Secret Service do not provide annual cybercrime statistics, but high-profile arrests are significantly up this year, says Shawn Henry, assistant director of the FBI Cyber Division.

Dozens of such actions reflect better-trained agents and prosecutors, stronger laws and more cooperation from crime fighters overseas. Strides in cybercrime fighting are particularly important now because most security experts point out that fraud soars during economic downturns. Cybercrime is an estimated $200 billion market.

For the first time, "It's not a question of whether you will be caught, but when," says Hemanshu Nigam, chief security officer of MySpace who, as a Microsoft executive, crafted a $250,000 bounty in late 2003 that led to the arrest of infamous German hacker Sven Jaschan.

Aiding the crime fighting:

▶ **More resources.** Federal agencies have a better understanding of technology and how to infiltrate organized crime groups, especially in Eastern Europe. "The threat is not going away. But our ability to impact the threat has become much better," says Henry.

The Secret Service has ramped up training for its agents, prosecutors and federal judges. About 1,000 agents are trained, significantly more than a year ago. "These investigations take time and expertise," says John Large, special agent in charge of the Secret Service Criminal Investigative Division.

▶ **International help.** The feds are partnering closely with peers in Romania, Turkey, Germany and elsewhere. "Romania is the gold standard," says Henry, who laid the groundwork with the country's national police. Working with them, the FBI has arrested 90 people, primarily phishers, this year.

Romanian Prosecutor General Laura Codruta Kövesi has led the effort to prosecute individuals with ties to international organized crime involved in computer and credit card fraud schemes. "The U.S. and their Romanian counterpart agencies are working as partners and colleagues," she says.

Henry says he met with cyberofficials in Moscow in January and that Russian agents are being trained in the U.S. "We think the relationship can be as fruitful as the one in Romania," he says.

▶ **Stiffer cyberlaws.** Sentencing guidelines have gotten tougher. "It's easier to get someone locked up," says Keith Schwalm, president of DNK Consulting and a former Secret Service agent who worked on cybersecurity issues. One law in particular has given prosecutors a crime-fighting tool. The Identity Theft Enforcement and Restitution Act of 2008 makes it a felony to damage 10 or more PCs used by or for the federal government or a financial institution.

Tech companies also are more aggressively pursuing crim[illegible] with existing laws. MySp[illegible] filed five lawsuits th[illegible] against spammers, or[illegible] resulted in a record [illegible] judgment for viola[illegible] eral a[illegible]

### Some federal cybercrime crackdowns in 2008

A federal crackdown on cybercrime rings has culminated in a flurry of high-profile actions this year that have put a dent in the estimated $200 billion illegal market. Among them:

▶ **October.** Dark Market, one of the Internet's most-notorious forums for stolen credit cards, is shut down. The FBI announces the arrests of 56 people worldwide associated with the operation and announces the prevention of $70 million in fraud.

Also shuttered: HerbalKing, the world's largest spam ring, responsible for billions of e-mail messages touting prescription drugs, "male-enhancement" pills and diet pills. A federal court in Chicago, acting on a complaint by the Federal Trade Commission, orders the shutdown.

▶ **August.** The Justice Department announces the indictments of 11 people worldwide for the theft of tens of millions of credit and debit card numbers of customers for nine major U.S. retailers, including TJX, parent company of T.J. Maxx, Marshalls and other stores. Two suspects, Damon Patrick Toey and Christopher Scott, have pleaded guilty, according to court records.

▶ **July.** Adam Vitale was sentenced to 30 months in prison for sending spam to more than 1.2 million AOL subscribers. Vitale was sentenced in federal court in Manhattan after pleading guilty more than a year ago to breaking anti-spam laws. He was also ordered to pay $180,000 to AOL in restitution.

He served time and was released.

By Jon Swartz

Miscellaneous Exhibits

CV '08 - 1496 - BR

# CERTIFICATE OF SERVICE

**CASE NAME:** MATTHEW R. YOUNG v. Intel Corporation

**CASE NUMBER:** (if known) ______

COMES NOW, Matthew R. Young, and certifies the following:

That I am incarcerated by the Oregon Department of Corrections at 777 Stanton Blvd. Ontario, OR 97914.

That on the 22 day of December, 2008, I personally placed in the Correctional Institution's mailing service A TRUE COPY of the following:

Request for waiver of Service of Summons, a complaint with attached Exhibits, and a Prepaid-pre-addressed Envelope, to the u.s. District court marked LEGAL MAIL.

I placed the above in a securely enclosed, postage prepaid envelope, to the person(s) named at the places addressed below:

Intel corporation
2111 N.E. 25th Ave
JF3 - 147
Hillsboro, OR 97124

(Signature) [signature]

Print Name Matthew R. Young
S.I.D. No.: 6242666
777 Stanton Blvd.
ontario, OR 97914

 Form 03.015